UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

No. 7:09-CV-84-WW

| | |
|---|---|
| CHRISTINE McMICHAEL, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court on the parties' cross Motions for Judgment on the Pleadings (DE's 10 & 13). The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for adjudication. Based upon consent of the parties under 28 U.S.C. § 636(c)(1), this case has been reassigned to the undersigned to conduct all proceedings (DE-15). For the following reasons, Plaintiff's Motion for Judgment on the Pleadings (DE-10) is DENIED, Defendant's Motion for Judgment on the Pleadings (DE-13) is GRANTED, and the final decision by Defendant is AFFIRMED.

**Statement of the Case**

Plaintiff applied for disability insurance benefits ("DIB") on June 24, 2004, alleging that she became unable to work on July 1, 1998 (Tr. 18). This application was denied at the initial and reconsideration levels of review (Tr. 18). A hearing was held before an Administrative Law Judge ("ALJ") on May 8, 2008 (Tr. 702-720). Plaintiff was represented during this hearing by a non-attorney (Tr. 18). On June 10, 2008, the ALJ determined that Plaintiff was not disabled (Tr. 15-25). The Social Security Administration's Office of Hearings and Appeals ("Appeals

1

Council") denied Plaintiff's request for review on March 26, 2009, rendering the ALJ's determination as Defendant's final decision (Tr. 4-7). Plaintiff filed the instant action on May 20, 2009 (DE-1).

## **Standard of Review**

This Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .
> *Id.*

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether the Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

Further, when a Plaintiff's disability insured status expires before the determination of her application for benefits, the relevant issue is whether such Plaintiff was disabled under the Act on

2

or before the date on which her insured status expired. *See* 42 U.S.C. §§ 423(a)(1)(A),423(c)(1); 20 C.F.R. §§ 404.101(a), 404.131(a), 404.130, 404.315(a); Social Security Ruling (SSR) 83-20, 1983 WL 31249 (S.S.A.); Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

### Analysis

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. ' 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. ' 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. ' 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. ' 404.1520(e); 20 C.F.R. ' 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. ' 404.1520(f).
> Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment (Tr. 20). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: 1) carpal tunnel syndrome; and 2) a history of neck surgery (Tr. 20). Next, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 20-21). The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC") to perform light work (TR. 21). Specifically, the ALJ determined that:

3

> [Plaintiff] was able to sit/stand/walk six hours each in an eight hour workday and was able to occasionally lift 20 pounds and frequently lift ten pounds. The claimant was able to use her hands frequently but not repetitively.
> (Tr. 21).

Based on this finding, the ALJ concluded that Plaintiff was able to perform her past relevant work as an administrative clerk (Tr. 24-25). Accordingly, the ALJ determined that Plaintiff had not been under a disability at any time since her alleged onset date through the date she was last insured, December 31, 2003 (Tr. 25). A large portion of the administrative record consists of treatments notes from Powell Medical Clinic (Tr. 181-594). Unfortunately, the handwriting of Plaintiff's treating physician, Dr. Eddie N. Powell, is difficult to read. Contrary to Plaintiff's argument, however, this lack of complete legibility does not change the fact that the ALJ's determinations were supported by substantial evidence, a summary of which now follows.

As stated above, Plaintiff received treatment from Powell Medical Clinic (Tr. 181-594). Although Dr. Powell's handwritten notes are indeed difficult to read, it must be noted that many of his findings were summarized on a form with check boxes. These forms typically indicated that Plaintiff's musculoskeletal system was in large part within normal limits or unchanged from the prior visit (Tr. 208, 209, 219, 220, 223, 224, 237, 238, 255, 256, 260, 261, 271, 272, 282, 283, 286, 287, 291, 292, 301, 302, 317, 318, 326, 327, 340, 341, 346, 347, 400, 408, 409, 417, 418, 430, 431, 434. 435, 443, 444, 452, 453, 458, 459, 465, 466, 539, 540, 543, 544, 547, 548, 551, 552, 556, 557, 561, 562, 565, 566, 570, 573, 574). On February, 20, 1998 a radiology report indicated that Plaintiff had a normal right shoulder (Tr. 593). Upon examination on February 21, 1998, Plaintiff: 1) demonstrated no evidence of a compression fracture or linear subluxation; 2) demonstrated no evidence of a rotator cuff tear or secondary sign of impingement on the musculotendious junction; 3) had normal gleno-labral definition; and 4) had no definitive

4

subacromial effusion or joint effusion (Tr. 591-592). Cervical disc herniation was observed, however (Tr. 592). Plaintiff underwent a motor nerve conduction velocity study on February 26, 1998, the results of which were normal (Tr. 589). Dr. Michele A. Hines diagnosed Plaintiff with "possibly arthritic changes" in her right hand on April 28, 1998 (Tr. 583). A radiology report dated June 20, 1998 indicated that Plaintiff demonstrated no evidence of disc space compromise or of a compression fracture (Tr. 579-580). However, a small subligamentous disc herniation was discovered (Tr. 579). Cervical and thoracic spine radiographs taken on January 28, 1999 revealed the following: 1) no acute fracture or dislocation of the cervical or thoracic spine; 2) mild levoconvexed scoliosis of the thoracic spine; 3) no degenerative disc disease of the thoracic spine; and 4) severe degenerative disc disease of the C5-6 disc with straightening of the cervical spine (Tr. 554). Dr. G. William Eason stated on July 24, 1999 that there had been no significant change in Plaintiff's small subligamentous disc herniation involving the left paracentral area of L3-L4 (Tr. 461). Plaintiff was examined by Dr. James E. Lowe, Jr. on September 21, 1999 (Tr. 450). A procedure was schedule to have several lesions removed (Tr. 450). On November 11, 1999 Plaintiff underwent another nerve conduction velocity examination (Tr. 529). This examination was abnormal and suggestive of: 1) bilateral sensorimotor ulnar neuropathy; and 2) left median motor neuropathy (Tr. 529). Plaintiff underwent a MRI of her right shoulder on December 23, 1999. This examination was suggestive "of a previous rotator cuff repair procedure with the current examination demonstrating no significant change from a previous MRI exam dated 2-21-98" (Tr. 515). There was no evidence of: 1) a re-tear in the supraspinatus tendon; or 2) an associated bursitis or joint effusion (Tr. 515). Another nerve conduction velocity study conducted on February 3, 2000 was suggestive of bilateral Sural Neuropathy (Tr. 508). A report of consultation dated March 2, 2000 indicated that Plaintiff complained of pain, weakness, and

5

numbness in both upper extremities (Tr. 499). Plaintiff was informed that she had bilateral carpal tunnel syndrome with ulnar nerve involvement (Tr, 499). Furthermore, Plaintiff was informed that these conditions would require surgery in the near future (Tr. 499). On April 26, 2000, Plaintiff underwent a release of the transverse carpal ligament, a release of the volar carpal ligament, and a release of De Quervain's disease of the right wrist (Tr. 471). She was in satisfactory condition after the procedure (Tr. 471). A echocardiogram conducted on July 19, 2000 was generally normal, although "borderline mitral valve prolapse[]" was noted (Tr. 424). Plaintiff underwent another MRI of her cervical spine on August 19, 2000 (Tr. 415). This MRI revealed no evidence of a cervical disc herniation or spinal stenosis (Tr. 415). X-rays of Plaintiff's pelvis and hip taken on November 30, 2000 revealed no evidence of an acute bone abnormality or dislocation (Tr. 402). On March 8, 2001, an MRI of Plaintiff's lumbar spine suggested "a change from subligamentous herniation to small central to left paracentral herniated nucleus pulpous development when correlated with the sagittal imaging sequence on comparative review with 1999 . . . exam" (Tr. 384-385). The MRI also revealed: 1) stenosis of the lateral recess angles of L4-L5; and 2) thickening of the ligamentum flava posteriorly (Tr. 385). Upon examination on April 9, 2001, Plaintiff had slightly decreased range of motion in her neck and significant paraspinal muscle spasm (Tr. 381). Her carpal tunnel incisions were well-healed (Tr. 381). In addition, she demonstrated significant residual weakness of the right abductor pollicis brevis and decreased grip on the right (Tr. 381). However, her other muscle groups were intact (Tr. 381). Likewise, her gait was normal (Tr. 381). It was opined that Plaintiff had severe arthritis (Tr. 381). However, she did not appear to have significant carpal tunnel syndrome and there was no evidence of radiculopathy (Tr. 381). Further surgery of her neck was not recommended (Tr. 381-382). Plaintiff stated on April 20, 2001 that she was in continuous pain all

6

over her body throughout the entire day (Tr. 383). Similarly, on June 29, 2001, Plaintiff indicated that she was in continuous pain in her neck, arms, hands and lower back (Tr. 374). Again on July 23, 2001, Plaintiff stated that she was in continuous pain in her neck and lower back (Tr. 364). Likewise, on August 25, 2001, Plaintiff indicated that she was in continuous pain in her lower back, ride side, neck and arms (Tr. 359). She repeated similar complaints on October 20, 2001, November 3, 2001, and December 29, 2001 (Tr. 329, 343, 349). A MRI of Plaintiff's right shoulder taken on March 21, 2002 revealed: 1) no interval change from Plaintiff's December 28, 1999 MRI; 2) no evidence of re-tear in the supraspinatus tendon area; 3) no evidence of a labral tear; and 4) no evidence of bursal surface inflammation (Tr. 299). Another nerve conduction velocity study was conducted on May 18, 2002. It indicated proximal sensorimotor polyneuropathy of the upper limbs (Tr. 289). Plaintiff underwent a pelvic CT on January 16, 2003 (Tr. 258). The CT revealed no evidence of an inflammatory mass effect or of a abnormal fluid development in the pelvis (Tr. 258). Another MRI of Plaintiff's lumbar spine revealed the following: 1) Plaintiff's L5-S1 was normal; and 2) Plaintiff's L4-L5 disc area had not significantly changed since a March 8, 2001 MRI (Tr. 248). On July 29, 2003 an x-ray of Plaintiff's left foot revealed no evidence of a stress fracture or dislocation (Tr. 234). Plaintiff underwent a colonoscopy on November 17, 2003 and was diagnosed with sigmoid colon diverticulosis (Tr. 211).

Plaintiff was examined by Dr. Douglas Arnson on September 8, 1998 (Tr. 134). Dr. Arnson determined that Plaintiff had disc space narrowing at the surgical level C5-6 (Tr. 134). There was no definite nerve root compression, however (Tr. 134). Likewise, there was no cord impingement (Tr. 134). Finally, Plaintiff also had a small central herniation at C6-7 which was causing minimal effacement of the ventral subarachnoid space (Tr. 134).

Dr. David Tomaszek treated Plaintiff from September 23, 1998 until January 28, 1999 (Tr. 124-133). Plaintiff underwent several cranial electrotherapy stimulation ("CES") sessions between during this time (Tr. 124-133). She generally tolerated these procedures well (Tr. 124-133). On October 20, 1998, Plaintiff stated that the CES sessions were helping her control her pain and sleep better (Tr. 127). Dr. Tomaszek stated on October 21, 1998 that Plaintiff suffered from "significant headaches, neck an arm pain, and secondary sleep disorder" (Tr. 126). It was again noted on October 29, 1998 that the CES sessions improved Plaintiff's sleep and pain control (Tr. 125). Finally, on January 28, 1999, Dr. Tomaszek stated that x-rays of Plaintiff's spine were unremarkable "[o]ther than degenerative changes at the site of [Plaintiff's] prior cervical surgery and some mild degenerative changes in the thoracic spine" (Tr. 124).

Plaintiff underwent the excision of multiple tumors on September 8, 1999 (Tr. 137). She tolerated the procedure well (Tr. 139). None of the tumors were cancerous (Tr. 140).

On October 16, 2003, Plaintiff was examined by Dr. Kurt Vernon based on complaints of abdominal pain (Tr. 215-216). During this examination, Dr. Vernon noted that Plaintiff had no difficulty with ambulation and did not suffer from chronic back pain (Tr. 215). Her muscle tone and strength were described as normal (Tr. 216). In addition, Plaintiff had a full range of motion throughout her extremities (Tr. 216).

Dr. William J. Craven examined Plaintiff on June 27, 2003 (Tr. 163). He diagnosed Plaintiff with: 1) diffuse arthritic problems; and 2) lumbar spinal stenosis with related discomfort (Tr. 163). On July 9, 2003, Plaintiff underwent a lumbar epidural injection (Tr. 160). During a follow up examination conducted on July 28, 2003, Plaintiff "relate[d] a notable improvement in her pain and a significant improvement in her level of activity" (Tr. 159). Plaintiff demonstrated mild paraspinal tenderness, although she had no discomfort on palpation (Tr. 159).

Plaintiff's RFC was evaluated on August 27, 2004 (Tr. 165-172). It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) about six hours in an eight-hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight-hour workday; and 5) lift and/or pull with no limitations other than those shown for lifting and carrying (Tr. 166). Furthermore, it was observed that Plaintiff could: 1) frequently kneel; 2) frequently crawl; 3) occasionally climb ramps and stairs; 4) occasionally balance; 5) occasionally stoop; 6) occasionally crouch; and 7) never climb ladders, ropes or scaffolds (Tr. 167). With regard to manipulative limitations, it was noted that Plaintiff could not reach overhead in all directions (Tr. 168). No other manipulative limitations were established (Tr. 168). Plaintiff had no visual or communicative limitations (Tr. 168-169). Other than avoiding concentrated exposure to hazards such as machinery and heights, no environmental limitations were imposed (Tr. 170).

Dr. David Brown evaluated Plaintiff's RFC on October 6, 2004 (Tr. 174-180). It was determined that Plaintiff could: 1) occasionally lift and/or carry 20 pounds; 2) frequently lift and/or carry 10 pounds; 3) stand and/or walk (with normal breaks) about six hours in an eight-hour workday; 4) sit (with normal breaks) for a total of about six hours in an eight-hour workday; and 5) lift and/or pull with no limitations other than those shown for lifting and carrying (Tr. 174). Plaintiff was deemed capable of occasionally climbing, balancing, stooping, kneeling, crouching, and crawling (Tr. 175). No manipulative, visual, communicative, or environmental limitations were established (Tr. 176-177).

Plaintiff also testified during the hearing in this matter (Tr. 702-720). She stated that she experienced neck and arm pain when sitting for any length of time (Tr. 706). In addition, Plaintiff indicated that her surgeries provided only minimal relief (Tr. 706). Furthermore, she indicated

that was essentially incapable of lifting a coffee cup (Tr. 707). She also testified that she experienced neck, shoulder, arm, lower back and leg pain (Tr. 707). Specifically, she estimated that she experienced the pain in her arms about 90 percent of the time (Tr. 708). Plaintiff indicated that she did not have full range of motion in her arms (Tr. 709). Likewise, Plaintiff testified that she had difficulty: 1) washing and combing her hair; 2) tying her shoes; and 3) picking up items (Tr. 709). In addition, Plaintiff stated that she was not able to do any housework and only minimal yard work (Tr. 710). According to Plaintiff, she could sit for between 30 minutes and two hours, depending upon the type of chair she was sitting in (Tr. 711). Plaintiff indicated that she could lift five pounds or less (Tr. 712).

The ALJ made the following findings with regard to this medical record and Plaintiff's testimony:

> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below . . .
>
> I have carefully considered the claimant's statements about her symptoms with the rest of the relevant evidence in the case record. I find that the claimant's allegations have been inconsistent with the medical evidence of record, the claimant's reports to her physicians, and the treatment sought and received for the period in issue.
>
> Regarding the severe impairments of carpal tunnel syndrome and status-post neck surgery, I find the evidence of record supports a residual functional capacity for light work with frequent use, but not repetitive use, of the hands for the period prior to December 31, 2003 (date disability insured status expired).
>
> In reviewing the records from Dr. Eddie Powell, covering a period from February 21, 1998 to August 2004, most of examinations showed the musculoskeletal system was within normal limits or unchanged from the prior visit . . .with the exception of occasional abnormalities like decreased right arm strength and right shoulder pain. On February 26, 1998, a report by Dr. A. N. Patel noted a normal nerve conduction velocity study of the upper limbs . . .

On September 8, 1998, at Wilson Regional MRI a magnetic resonance imaging scan of the cervical spine showed surgical level at C5-6 with no cord impingement . . .

When seen by Dr. Powell on September 14, 1998, the claimant's neck was within normal limits.

The right upper extremity had decreased right arm strength but was otherwise within normal Limits . . .

On October 21, 1998, Dr. David E. Tomaszek noted the claimant had been undergoing supervised cranial electrical stimulation for headaches, neck pain, and arm pain. He stated that the claimant reported improvement . . .

On November 11, 1999, at Neuroscience Direct, a nerve conduction study showed bilateral sensorimotor ulnar neuropathy and evidence of left median motor neuropathy . . .

On March 2, 2000, when seen by Dr. James E. Lowe, Jr., a hand surgeon, he noted the test results showing bilateral carpal tunnel syndrome with ulnar nerve involvement. . . .Subsequently, on April 26, 2000, at Good Hope Hospital, Dr. Lowe performed release of the right carpal ligament, volar carpal ligament, and De Quervain's disease. The diagnosis was De Quervain's disease of the right wrist, carpal tunnel syndrome, ulnar tunnel syndrome, fibrosis of the median nerve and adhesions, and active synovitis of the flexor tendons within the carpal canal . . .

On April 9, 2001, the claimant was examined in the Division of Neurosurgery at Duke University Medical Center by Dr. Dennis A. Turner. Dr. Turner's assessment was diffuse neck pain status post anterior cervical discectomy fusion. He also noted that she did not appear to have a significant carpal tunnel syndrome. He stated there was no evidence for radiculopathy. He related he saw no need for further neck surgery . . .

On March 21, 2002, at Dosher Hospital, a magnetic resonance imaging scan of the cervical spine showed no evidence of cervical disc herniation or spinal stenosis . . .

On May 15,2003, at Professional Diagnostic Services, a magnetic resonance imaging scan of thelumbar spine showed spinal stenosis at L4-5 . . . .

On June 17,2003, when examined by Dr. William J. Craven, a neurologist, he noted that the claimant had undergone a prior cervical laminectomy in 1998, carpal tunnel surgery on the right, and rotator cuff repair on the right. The claimant complained of back pain from a previous fall.  The examination showed a stable gait . . .

Notably, on October 16, 2003, when examined by Dr. Kurt Vernon for abdominal

11

pain, in the "Review of Systems," the claimant stated she had no difficulty with ambulation and had no chronic back pain. Additionally, Dr. Vernon's examination showed the claimant had a full range of motion of the extremities throughout with normal muscle strength and tone . . .

On January 28, 2004, an upper extremity examination by Dr. Craven was unremarkable. When seen on June 9, 2004, Dr. Craven found the claimant had good mobility of her head and neck, and normal upper extremity motor and sensory functioning . . .

Although outside the period in issue, I note that on October 7, 2005, when examined at the Center for Pain Management by Dr. Matthew D. McLaren, the claimant had 5/5 muscle strength in the upper extremities, limited range of motion of the cervical spine, and intact motor functioning. Her diagnoses included status-post C5-6 fusion. Furthermore, on May 14, 2007, an examination by Dr. John H. Knab showed 5/5 strength in the deltoid, biceps, triceps, wrist flexors, wrist extensors, and grip in the bilateral upper extremities . . .

Thus, I find that for the period from July 1998 through December 31, 2003, the claimant's severe impairments of carpal tunnel syndrome and status-post cervical spine surgery are consistent with a conclusion that the claimant could have performed light work with a limitation of frequent use of her hands but not repetitive.

Specifically, for the period in issue, the claimant has described daily activities which are not inconsistent with a residual functional capacity for light work with no repetitive use of the hands.

The claimant testified she traveled to New York and that she drives. On March 7, 2006, the claimant reported she walked three and a half miles.

Although the clinical evidence shows the claimant underwent carpal tunnel surgery on the right side and neck surgery, there is very little follow-up treatment and no significant post-operative problems . . .

 . . .I note that no treating physician has stated the claimant was unable to work during the period in issue . . .

 . . .I have considered the findings of fact made by state agency medical consultants and other program physicians. On October 6, 2004, Dr. David H. Brown found the claimant limited to light exertion with occasional postural limitations. Dr. Brown noted the claimant had no manipulative limitations adding the claimant could perform frequent, but not continuous handling. The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services found that the claimant was not disabled. Upon review of

12

> the record, I am in agreement with the limitation to light work with only frequent use of the hands, but not repetitive. Subsequent medical records reveal 5/5 motor strength in all extremities. Although these physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, these opinions do deserve some weight as they are supported by the objective medical evidence of record.
>
> (Tr. 22-24).

The Court hereby finds that there was substantial evidence to support each of the ALJ's conclusions. Moreover, the ALJ properly considered all relevant evidence, including the evidence favorable to Plaintiff, weighed conflicting evidence, and fully explained the factual basis for his resolutions of conflicts in the evidence. Plaintiff's argument relies primarily on the contention that the ALJ improperly weighed the evidence. However, this Court must uphold Defendant's final decision if it is supported by substantial evidence. Although Plaintiff may disagree with the determinations made by the ALJ after weighing the relevant factors, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Because that is what Plaintiff requests this Court do, her claims are without merit. The undersigned will nonetheless address portions of Plaintiff's specific assignments of error.

**The ALJ properly analyzed Plaintiff's alleged impairments**

Plaintiff asserts that the ALJ erred by not finding that her back and shoulder impairments were individually "severe" at step two of the evaluation process. However, "it is not reversible error where an ALJ does not consider whether an impairment is severe at step two of the sequential evaluation, provided the ALJ considers that impairment in subsequent steps." Tarpley v. Astrue, 2009 WL 1649774, at *2 (E.D.N.C. June 1, 2009). Here, the ALJ specifically found that Plaintiff satisfied the severity requirement at step two of the process by finding that Plaintiff had two "severe" conditions, carpal tunnel syndrome and a history of neck surgery (Tr. 20). He then

13

discussed and evaluated, in detail, evidence concerning each of Plaintiff's impairments, including those impairments that were not specifically identified as being independently "severe" at step two of the process (Tr. 21-24). The ALJ's subsequent and carefully delineated determination of Plaintiff's RFC incorporated the relevant, demonstrable limitations on the basis of that evidence. Accordingly, this assignment of error is without merit.

**The ALJ was not required to re-contact Plaintiff's treating physician**

Plaintiff also argues that the ALJ erred by not re-contacting Plaintiff's treating physician to decipher his illegible treatment notes and render an opinion concerning Plaintiff's condition. Specifically, Plaintiff asserts that "most of the medical evidence in this case comes from the treating physician's notes, which are only slightly more legible than the Rosetta Stone . . . [s]o it would not be surprising if the ALJ had simply given up trying to decipher them . . ." (DE 10-1, pg. 11). First, as noted above, the ALJ did include the findings of Plaintiff's treating physician in his analysis. Regardless, the duty to re-contact a treating source arises only when the evidence as a whole is inadequate to determine the issue of disability. 20 C.F.R. §§ 404.1512(e), 404.1527(c)(2). *See also*, Mink v. Apfel, 2000 WL 665664 (4th Cir. 2000) (unpublished). The record here is more than adequate to determine disability, as it contains numerous reports from different doctors assessing Plaintiff's functional capacities. *See*, Craig v. Chater, 76 F.3d 585, 591 (4th Cir. 1996). Therefore, this assignment of error is also meritless.

## **Conclusion**

For the aforementioned reasons, Plaintiff's Motion for Judgment on the Pleadings (DE-10) is DENIED, that Defendant's Motion for Judgment on the Pleadings (DE-13) is GRANTED, and that the final decision by Defendant is AFFIRMED.

DONE AND ORDERED in Chambers at Raleigh, North Carolina on Friday, July 02, 2010.

_____
WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE